RCH:MAA/EWS/SMS
F. #2021R00664

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

JULIO MEDINA,
CHRISTOPHER DANTZLER and
WEIHONG HU,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GRAND JURY CHARGES:

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
*   FEBRUARY 11, 2025   *
BROOKLYN OFFICE

I N D I C T M E N T

Cr. No. 25-CR-54
(T. 18, U.S.C., §§ 371, 924(d)(1),
981(a)(1)(C), 982(a)(1), 982(b)(1),
1343, 1346, 1349, 1952(a)(3)(A),
1956(h), 2 and 3551 et seq.; T. 21,
U.S.C., § 853(p); T. 28, U.S.C.,
§ 2461(c))

Judge Rachel P. Kovner
Magistrate Judge Lara K. Eshkenazi

At all times relevant to this Indictment, unless otherwise indicated:

## INTRODUCTION AND OVERVIEW

1.      In the midst of the outbreak of the novel coronavirus, SARS-CoV-2

("Covid-19"), New York City provided tens of millions of dollars to a non-profit organization to

administer an emergency transitional housing program (the "Emergency Housing Program"), in

partnership with local hotels and other businesses, to combat the spread of Covid-19 in New

York City jails.   Under the Emergency Housing Program, inmates were released to New York

City hotels and offered various reentry services, including mental health, security, job training

and food services.   Through kickbacks and bribes, the defendants JULIO MEDINA,

CHRISTOPHER DANTZLER and WEIHONG HU capitalized on the Covid-19 crisis and

exploited the Emergency Housing Program by engaging in a corrupt scheme to line their own

pockets with millions of dollars intended to protect the public.

## The Emergency Housing Program

2.      In or around April 2020, New York City developed the Emergency

Housing Program to help curb the spread of the Covid-19 pandemic.   Under the Emergency

Housing Program, inmates were released from local prisons and housed in hotels in New York

City, including in Brooklyn and Queens.   Beginning in or around June 2020, the New York City

Mayor's Office of Criminal Justice ("MOCJ") contracted with a non-profit organization, the

identity of which is known to the Grand Jury (together with its affiliates, the "Organization") to

operate the Emergency Housing Program.

## The Defendants and Relevant Entities

3.      The defendant JULIO MEDINA founded and served as the executive

director and chief executive officer of the Organization.   MEDINA participated in various

public service roles in connection with his work with the Organization.   For example, between

approximately October 2021 and November 2022, MEDINA served as a member and, at times,

the acting chair of New York City's Board of Correction, a panel that regulated and oversaw

New York City's jails.

4.      The Organization provided various reentry services to formerly

incarcerated individuals.   Following its selection by MOCJ to operate the Emergency Housing

Program, the Organization entered into agreements with various hotels to operate as reentry

hotels under the Emergency Housing Program (collectively, the "Program Hotels").   In total,

between in or about June 2020 and December 2023, the Organization received approximately

$122 million in public funds from MOCJ to operate the Emergency Housing Program at the

Program Hotels.

5.    The defendant CHRISTOPHER DANTZLER served as the president of a company, an entity the identity of which is known to the Grand Jury, that purported to provide the Organization with security services at the Program Hotels (together with its affiliates, "the Security Company") pursuant to the Emergency Housing Program.   Prior to serving as the president of the Security Company, DANTZLER worked as an electrician.

6.    The Security Company began operating in or around November 2020, only a few months after the Organization began operating the Emergency Housing Program. The Security Company was not a licensed security company and did not directly provide security services.   Rather, the Security Company subcontracted with other security firms to provide security services for the Program Hotels.   Between approximately January 2021 and May 2022, the Security Company received approximately $21 million in public funds from the Organization for purportedly providing security services at the Program Hotels, despite not actually providing any security services itself.   Of that amount, the Security Company paid only approximately $12 million to subcontractors who actually provided security services at the Program Hotels; the defendant CHRISTOPHER DANTZLER personally retained the remaining $9 million in public funds.

7.    The defendant WEIHONG HU operated and/or controlled several hotels in New York City, including two hotels in Queens (collectively, the "HU Hotels") that operated as Program Hotels under the Emergency Housing Program.   Between in or about October 2021 and November 2023, the HU Hotels received approximately $12 million in public funds from the Organization for their participation in the Emergency Housing Program as Program Hotels.

8.    The defendant WEIHONG HU also served as a member of a company that provided food services to formerly incarcerated individuals residing at the Program Hotels under

the Emergency Housing Program, including at the HU Hotels (together with its affiliates, "the Catering Company," and collectively with the HU Hotels, the "HU Businesses"). Before the Emergency Housing Program was created, the Catering Company had operated as a construction company. In or about September 2020, HU, together with others, repurposed the Catering Company as a food services business so the defendants and their co-conspirators could obtain additional public funds under the Emergency Housing Program. Between in or about September 2020 and July 2023, the Catering Company received approximately $17 million in public funds from the Organization for providing food services to the Program Hotels pursuant to the Emergency Housing Program.

<u>The Defendants' Criminal Scheme</u>

9. In or about and between April 2020 and December 2024, the defendants conspired to corruptly divert millions of dollars that the Organization was receiving under the Emergency Housing Program to personally enrich themselves and their co-conspirators.

10. During the relevant time period, the defendant JULIO MEDINA solicited and received bribes and kickbacks from the defendants CHRISTOPHER DANTZLER and WEIHONG HU in exchange for MEDINA providing business through the Organization to the Security Company and the HU Businesses under the Emergency Housing Program.

11. These bribes and kickbacks took various forms, including hundreds of thousands of dollars in United States currency; financing for a luxury vehicle; payments towards debts held by the defendant JULIO MEDINA and his family, including a mortgage; and the purchase of two homes, both which were made in the names of MEDINA's co-conspirators or entities associated with them, to conceal the nature and source of the bribes and kickbacks.

12.     For example, on or about September 11, 2020, the Organization prepared two checks made out to the Catering Business, for $103,600 and $84,000, respectively (collectively, the "Emergency Housing Program Checks").

13.     The following day, on or about September 12, 2020, the defendants JULIO MEDINA and WEIHONG HU met at one of the HU Hotels in Queens, New York.   That meeting was captured by surveillance cameras at the hotel.   As set forth in the pictures below, during the meeting HU took a wrapped stack of United States currency out of her wallet, put it into a manila envelope, and provided it to MEDINA, who put it into his bag.   During the same meeting, HU received what appear to be the Emergency Housing Program Checks from MEDINA.   Approximately two days later, the Emergency Housing Program Checks were deposited into a bank account associated with the Catering Company.









14.    In addition, in or about and between August 2021 and September 2021,

the defendant CHRISTOPHER DANTZLER, through the Security Company, paid

approximately $75,000 toward several debts incurred by the defendant JULIO MEDINA and members of his family, including a mortgage and a vehicle loan.

15.     In or about November 2021, the defendant WEIHONG HU, through one of the HU Businesses, financed a luxury vehicle for the defendant JULIO MEDINA valued at approximately $107,000.   Thereafter, HU caused to be made a series of monthly payments toward the Luxury Vehicle for MEDINA, for a total of more than $50,000.

16.     In or about September 2022, the defendants CHRISTOPHER DANTZLER and WEIHONG HU purchased a town house for the defendant JULIO MEDINA in Washington Heights, New York, for approximately $1.3 million.

17.     In or about May 2023, the defendant CHRISTOPHER DANTZLER paid to purchase and renovate a house for the defendant JULIO MEDINA in Clifton Park, New York (the "House") for approximately $750,000.   In or about September 2024, DANTZLER executed an indenture causing the deed to the House to be amended to include one of MEDINA's family members as a tenant-in-common.

18.     As part of the scheme, the defendant JULIO MEDINA executed or caused to be executed multiple contracts with MOCJ on behalf of the Organization.   Some of the contracts that MEDINA executed included budgets setting forth the costs of administering the Emergency Housing Program.   The budgets were fraudulently inflated to account for the cost of the bribes and kickbacks to be paid to him by the defendants CHRISTOPHER DANTZLER and WEIHONG HU.   In turn, DANTZLER and HU submitted, or caused to be submitted, invoices from companies they controlled that concealed the payment of bribes and kickbacks.   These invoices were provided to MOCJ to obtain payment for the fraudulently invoiced services administered under the Emergency Housing Program.

19.     The defendants also took steps to conceal the criminal scheme, including from New York City officials.   On or about September 29, 2022, the defendant JULIO MEDINA emailed a document setting forth the Organization's responses to various queries from New York City officials scrutinizing the Organization's operation of the Emergency Housing Program, including one query asking whether "[the Organization] or any employee of [the Organization] or immediate family member (i.e., spouse/domestic partner, child, sibling, or parent of the employee) received anything of value from [the Security Company] or [the defendant CHRISTOPHER DANTZLER] directly or indirectly[.]"   The response sent by MEDINA falsely stated, "Other than the contracted services that [the Organization] received from [the Security Company] or [DANTZLER], [the Organization] does not have any awareness or knowledge that any employee of [the Organization] or immediate family member of [the Organization] employee received, directly or indirectly, anything of value from [the Security Company] or [DANTZLER]."

20.     The defendants and their co-conspirators discussed the fraudulent scheme using text messages and cellular phones.   For example, on or about May 22, 2023, as part of an exchange of text messages between the defendant JULIO MEDINA and an employee of the defendant WEIHONG HU concerning the payment of Emergency Housing Program funds, MEDINA wrote, "Don't call me no more.  I don't fucking trust you!  When I get the payment I will call you.  You have other people on the call.  You know I'm under investigation.  You are fucking with the wrong person!"

21.     In total, the defendants CHRISTOPHER DANTZLER and WEIHONG HU provided the defendant JULIO MEDINA with at least $2.5 million in United States currency

and in-kind benefits in exchange for MEDINA steering approximately $51 million in public funds from the Emergency Housing Program to the Security Company and the HU Businesses.

## COUNT ONE
### (Wire Fraud Conspiracy)

22.     The allegations contained in paragraphs one through 21 are realleged and incorporated as if fully set forth in this paragraph.

23.     In or about and between April 2020 and December 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JULIO MEDINA, CHRISTOPHER DANTZLER and WEIHONG HU, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud MOCJ, and to obtain money and property from it by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT TWO
### (Honest Services Wire Fraud)

24.     The allegations set forth in paragraphs one through 21 are realleged and incorporated as if fully set forth in this paragraph.

25.     In or about and between April 2020 and December 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JULIO MEDINA, CHRISTOPHER DANTZLER and WEIHONG HU, together with others, did knowingly and intentionally devise a scheme and artifice to defraud the Organization

of its intangible right to the honest services of MEDINA through bribery and kickbacks, to wit: one or more payments to MEDINA, and for the purpose of executing such scheme and artifice, the defendants, together with others, transmitted and caused to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: an email dated September 29, 2022 from MEDINA attaching a document titled "Risk Management Response 9-29-2022.docx."

(Title 18, United States Code, Sections 1343, 1346, 2 and 3551 et seq.)

COUNT THREE
(Conspiracy to Violate the Travel Act)

26.     The allegations contained in paragraphs one through 21 are realleged and incorporated as if fully set forth in this paragraph.

27.     In or about and between April 2020 and December 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JULIO MEDINA, CHRISTOPHER DANTZLER and WEIHONG HU, together with others, did knowingly and willfully conspire to use one or more facilities in interstate and foreign commerce with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on, of one or more unlawful activities, to wit: Commercial Bribing in the Second Degree, in violation of New York Penal Law Sections 180.00 and 20.00, and Commercial Bribe Receiving in the Second Degree, in violation of New York Penal Law Sections 180.05 and 20.00, and thereafter to perform acts to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on, of such unlawful activity, contrary to Title 18, United States Code, Section 1952(a)(3).

28.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants JULIO MEDINA, CHRISTOPHER

DANTZLER and WEIHONG HU, together with others, did commit and cause the commission of, among others, the following overt acts:

OVERT ACTS

(a)    On or about September 11, 2020, the Organization prepared the Emergency Housing Program Checks.

(b)    On or about September 12, 2020, HU and MEDINA met at one of the HU Hotels in Queens, New York.

(c)    On or about September 12, 2020, HU gave MEDINA United States currency during the meeting at one of the HU Hotels in Queens, New York.

(d)    On or about September 13, 2020, MEDINA deposited approximately $3,000 in United States currency into his personal bank account.

(e)    On or about September 14, 2020, the Catering Business deposited the Emergency Housing Program Checks into one of its bank accounts.

(f)    On or about September 17, 2021, DANTZLER issued or caused to be issued a check in the amount of $20,000 from a bank account associated with the Security Company, which was applied to an outstanding debt held by MEDINA.

(g)    On or about September 29, 2022, MEDINA emailed a document on behalf of the Organization to New York City officials containing misrepresentations about the Security Company.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT FOUR
(Use of Facility of Interstate Facilities in Aid of Bribery)

29.     The allegations contained in paragraphs one through 21 are realleged and incorporated as if fully set forth in this paragraph.

30.     In or about and between April 2020 and December 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JULIO MEDINA, CHRISTOPHER DANTZLER and WEIHONG HU, together with others, did knowingly and intentionally use one or more facilities in interstate and foreign commerce, to wit: (i) one or more cellular telephones, (ii) electronic mail and (iii) wire transfers, with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of unlawful activity, to wit: Commercial Bribing in the Second Degree, in violation of New York Penal Law Section 180.00, and Commercial Bribe Receiving in the Second Degree, in violation of New York Penal Law Section 180.05, and thereafter performed acts to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of such unlawful activity.

(Title 18, United States Code, Sections 1952(a)(3)(A), 2 and 3551 et seq.)

## COUNT FIVE
(Money Laundering Conspiracy)

31.     The allegations contained in paragraphs one through 21 are realleged and incorporated as if fully set forth in this paragraph.

32.     In or about and between April 2020 and December 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JULIO MEDINA, CHRISTOPHER DANTZLER and WEIHONG HU, together with others, did knowingly and intentionally conspire:

(a)      to engage in one or more monetary transactions within the United States in and affecting interstate and foreign commerce, by, through and to one or more financial institutions, in criminally derived property of a value greater than $10,000 and derived from one or more specified unlawful activities, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, contrary to Title 18, United States Code, Section 1957(a); and

(b)      to conduct one or more financial transactions, to wit: transactions in and affecting interstate and foreign commerce and transactions involving the use of a financial institution that is engaged in, and the activities of which affect, interstate and foreign commerce, which transactions involved the proceeds of one or more specified unlawful activities, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS ONE AND TWO

33.      The United States hereby gives notice to the defendants that, upon their conviction of either of the offenses charged in Counts One and Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

34.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        (a)     cannot be located upon the exercise of due diligence;

        (b)     has been transferred or sold to, or deposited with, a third party;

        (c)     has been placed beyond the jurisdiction of the court;

        (d)     has been substantially diminished in value; or

        (e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS THREE AND FOUR

35.    The United States hereby gives notice to the defendants that, upon their conviction of any of the offenses charged in Counts Three and Four, the government will seek forfeiture in accordance with: (a) Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which requires any person convicted of such offenses to forfeit any property, real or personal, constituting or derived from proceeds obtained directly or indirectly as a result of such offenses; and (b) Title 18, United States Code, Section 924(d)(1) and Title 28, United States Code, 2461(c), which require the forfeiture of any firearm or ammunition involved in or used in any violation of any other criminal law of the United States.

36.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        (a)     cannot be located upon the exercise of due diligence;

        (b)     has been transferred or sold to, or deposited with, a third party;

        (c)     has been placed beyond the jurisdiction of the court;

        (d)     has been substantially diminished in value; or

        (e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 924(d)(1) and 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNT FIVE

37.     The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count Five, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

38.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        (a)     cannot be located upon the exercise of due diligence;

        (b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

property of the defendants up to the value of the forfeitable property described in this forfeiture

allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United

States Code, Section 853(p))

A TRUE BILL

/s/
FOREPERSON

John J. Durham

JOHN J. DURHAM
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK